**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Beverage Distributors, Inc., et al.,** | **Consolidated Case Nos.:** |
| | **2:08–cv–827** |
| **Plaintiffs,** | **2:08–cv–931** |
| | **2:08–cv–1112** |
| v. | **2:08–cv–1131** |
| | **2:08–cv–1136** |
| **Miller Brewing Company, et al.,** | **Judge Michael H. Watson** |
| **Defendants.** | |

### OPINION AND ORDER

These consolidated diversity actions arise from the purported termination of
alcoholic beverage distributor franchises governed by the Ohio Alcoholic Beverages
Franchise Act ("ABFA" or "Act"), Ohio Rev. Code §§ 1333.82–1333.87.  The cases
present the central issue whether one of the Defendants is a "successor manufacturer"
under Ohio Rev. Code § 1333.85(D) and therefore entitled to terminate the franchises
in the absence of just cause or consent.  Both sides move for summary judgment on
the issue.   For the reasons that follow, the Court grants Plaintiffs' motions for summary
judgment and denies Defendants' motions for summary judgment.

### I. BACKGROUND

The essential facts are undisputed.  In the simplest terms, these cases entail the
creation of a joint venture, Defendant MillerCoors LLC ("MillerCoors") by two competing
beer manufacturers, Defendant Miller Brewing Company ("Miller") and Defendant Coors

Brewing Company ("Coors").[1] The stated purpose of the joint venture was to better position the Miller and Coors brands to compete with the dominant beer manufacturer in the United States, Anheuser Busch.

Plaintiffs are Ohio wholesalers of beer and wine. Prior to the launch of MillerCoors in July 2008, each Plaintiff acted as the exclusive distributor of Miller and/or Coors brands within that Plaintiff's defined territory pursuant to written franchise agreements.

In about 2002, Miller began to explore a transaction with Coors. In December 2007, Miller and Coors entered a Joint Venture Agreement which contemplated the creation of MillerCoors. MillerCoors was created as a Delaware limited liability company in April 2008. On July 1, 2008, SAB Miller, Miller, Molson Coors, and Coors entered the MillerCoors LCC Amended and Restated Operating Agreement ("Operating Agreement") governing the operation of the MillerCoors joint venture. Operating Agreement, ECF No. 115–9, 10. On that date, Miller and Coors contributed and assigned most of their assets in the United States to MillerCoors. The assignment included the distribution agreements Miller and Coors had with Plaintiffs. Miller and Coors both engaged in restructuring of their respective businesses and assets in anticipation of the launch of MillerCoors.

Miller and Coors each have a 50% voting interest in MillerCoors. Miller has 58% economic interest in MillerCoors, while Coors has a 42% economic interest in MillerCoors.

---

[1]Miller is the wholly-owned subsidiary of Defendant SABMiller, plc ("SAB Miller"), and Coors is the wholly-owned subsidiary of Defendant Molson Coors Brewing Company ("Molson Coors").

Miller and Coors each have the right to appoint five members of the ten-member MillerCoors board of directors. Operating Agreement § 5.3, ECF No. 115–9. Miller appointed five of its own current officers or employees to serve on the MillerCoors board of directors. Jordan Dep. 132–33, ECF No. 126–1. Likewise, Coors appointed five of its own current officers or employees to the MillerCoors board. *Id.* For example, Peter Coors, who is chairman of the Molson Coors board, also serves as chairman of the MillerCoors board. Operating Agreement § 5.6(a), ECF No. 115–9; Jordan Dep. 186, ECF No. 126–1; Long Dep. 41–42, ECF No. 126–4. Directors may be removed at any time with or without cause by the company that appointed them. Operating Agreement § 5.3(c), ECF No. 115–9. The board members owe their fiduciary duty to the company that appointed them, not to MillerCoors or the other directors. *Id.* § 11.1. If the MillerCoors board is deadlocked, the matter is referred to the CEOs of SAB Miller Molson Coors. *Id.* § 12. If the CEOs are unable to agree, the matter is deemed to have not been approved by the board. *Id.* § 12.7.

The MillerCoors board of directors did not appoint MillerCoors' executive officers. Rather, Miller and Coors each selected the officers of MillerCoors. For example, Coors appointed the CEO and Miller appointed the CFO. Jordan Dep. 93–94, 123–24, ECF No. 126–1. All of the executive officers of MillerCoors are former officers or employees of Miller or Coors. Jordan Dep. 124, ECF No. 123–1; Long Dep. 44, ECF No. 126–4. For example, Coors appointed Leo Keily to be the CEO of MillerCoors. Keily Dep. 8, ECF No. 126–3. Keily formerly served as the CEO of Coors. *Id.* Likewise, Miller appointed Gavin Hattersley to be CFO of MillerCoors. *Id.* at 43. Hattersley formerly served as the CFO of Miller. *Id.* The four-member committee that recommends

executive compensation and benefits to the MillerCoors board includes the CEOs of
SAB Miller and Molson Coors or their nominees. MillerCoors' Compensation and
Human Resources Charter 1, ECF No 126–13. The Operating Agreement provides for
monthly cross-functional meetings between the MillerCoors executives and their
counterparts in SAB Miller and Molson Coors. Operating Agreement § 8.9, ECF No.
115–10. Thus, the Operating Agreement contemplates that the CEO of MillerCoors will
meet monthly with the CEOs of SAB Miller and Molson Coors. *Id.* Similarly, the CFO of
MillerCoors is required to meet monthly with the CFOs of SAB Miller and Molson Coors.
*Id.* MillerCoors' Rule 30(b) deponent confirmed that the cross-functional meetings
occur. Jordan Dep. 143–44, ECF No. 126–1. At one point, MillerCoors CEO Leo Kiely
sought input from from SAB Miller and Molson Coors concerning a request by a
distributor to acquire distribution rights in Denver, Colorado. Kiely Dep. 73–77, ECF No.
126–3. Tom Long, COO of MillerCoors, acknowledged that if the CEO of SAB Miller
disagreed with him and Kiely about the repositioning of the important Miller Lite brand,
the decision of the SAB Milller CEO would prevail. Long Dep. 98–99, ECF No. 126–4.

MillerCoors' revenues and cash are distributed directly to Miller and Coors.
Wyman Dep. 112, 125–26, ECF No. 126–2. MillerCoors then asks Miller and Coors for
cash back to meet MillerCoors' operating and capital requirements. *Id.* MillerCoors
does not take on any debt under this arrangement. *Id.* at 123–25.

Between August 19 and September 4, 2008, MillerCoors notified Plaintiffs that it
intended to terminate their distribution rights as a successor manufacturer pursuant to
Ohio Rev. Code § 1333.85(D). Plaintiffs began filing these consolidated lawsuits
shortly thereafter, seeking a declaration that Defendants lack just cause or any other

basis to terminate their distributorships, and an injunction preventing Defendants from terminating Plaintiffs as distributors.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Petty v. Metro. Gov't. of Nashville-Davidson Cnty.*, 538 F.3d 431, 438–39 (6th Cir. 2008).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Reeves*, 530 U.S. at 150–51. Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. DISCUSSION

Defendants argue that MillerCoors is a "successor manufacturer" within the meaning of Ohio Rev. Code § 1333.85(D), and is therefore entitled to terminate Plaintiffs' franchises without consent or just cause. Plaintiffs contend, *inter alia*, that MillerCoors does not qualify as a successor manufacturer because the joint venture partners, Miller and Coors, still exercise control over MillerCoors.

### A. Overview of the ABFA

The issues, as framed by the parties' arguments, require the Court to construe certain provisions of the ABFA. As in all such cases, statutory construction begins with "'the language of the statute and the purpose to be accomplished.'" *InBev USA LLC v. Hill Distrib. Co.*, 2:05–cv–298, 2006 U.S. Dist. LEXIS 97423, at *17 (S.D. Ohio Apr. 3, 2006) (quoting *Christe v. GMS Mgt. Co.*, 88 Ohio St. 3d 376, 377 (1997)). If the language of the statute is clear and unambiguous, no interpretation is required. *Id.* On the other hand, if the statute's language is unclear, then the Court "must consider other factors such as the circumstances surrounding enactment, the spirit of the statute, public policy, and the consequences of a particular interpretation." *Id.*

The Court will briefly examine the Act in its entirety before turning to the parties' arguments. As is often the case, the first section of the Act sets forth various

definitions, including "manufacturer" and "distributor." "'Manufacturer' means a person, whether located in this state or elsewhere, who manufactures or supplies alcoholic beverages to distributors in this state." Ohio Rev. Code § 1333.82(B). "'Distributor' means a person who sells or distributes alcoholic beverages to retail permit holders in the state, but does not include the state or any of its political subdivisions." Ohio Rev. Code § 1333.82(C). It is undisputed that MillerCoors is currently a manufacturer and Plaintiffs are distributors within the meaning of the Act. Notably, the Act does not define "successor manufacturer."

The next section of the Act requires manufacturers to contract in good faith with distributors, and to reduce the franchise agreement to writing. Ohio Rev. Code § 1333.83. The same section also renders void and unenforceable any provision in a franchise agreement that purports to waive any of the Act's prohibitions. Section 1333.83 further provides that if a manufacturer distributes alcoholic beverages to a distributor for ninety days or more without a written contract, a franchise agreement governed by the Act is deemed to arise by operation of law.

The next provision of the Act places limitations on manufacturers' conduct notwithstanding the terms of the franchise agreement. Ohio Rev. Code § 1333.84. For example, it requires manufacturers to act in good faith and with just cause, and prohibits manufacturers from adding franchises for the same brand within the territory of an existing distributor of that brand. Ohio Rev. Code § 1333.84(A), (B). It also forbids manufacturers from requiring distributors to submit certain financial information as a requirement to retain a franchise. Ohio Rev. Code § 1333.84(C).

The provision that follows, § 1333.85, goes to the heart of the instant cases.[2]

---

[2]  Section 1333.85 states:

Except as provided in divisions (A) to (D) of this section, no manufacturer or distributor shall cancel or fail to renew a franchise or substantially change a sales area or territory without the prior consent of the other party for other than just cause and without at least sixty days' written notice to the other party setting forth the reasons for such cancellation, failure to renew, or substantial change.

(A) Neither party shall be required to give to the other party such notice if any of the following events occur:

(1) The filing of a petition in bankruptcy or an assignment for the benefit of creditors by the other party;

(2) The filing of an involuntary petition in bankruptcy against either party, which petition is not dismissed within thirty days;

(3) The cancellation, revocation, or suspension for more than thirty days of any permit required to be held by either party to authorize the handling of alcoholic beverages.

The occurrence of any one of the foregoing events shall constitute just cause for cancellation or failure to renew a franchise or substantially changing a sales area or territory without the prior consent of the other party.

(B) The occurrence of any of the following events shall not constitute just cause for cancellation of or failure to renew a franchise or substantially changing a sales area or territory without the prior consent of the other party:

1) The failure or refusal on the part of either party to engage in any act or practice which would result in a violation of any federal law or regulation or any law or rule of this state;

(2) The restructuring, other than in bankruptcy proceedings, of a manufacturer's business organization;

(3) A unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of sections 1333.82 to 1333.86 of the Revised Code by the distributor;

(4) A manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control.

(C) If a manufacturer or distributor cancels or fails to renew a franchise, the distributor shall sell to the manufacturer and the manufacturer shall purchase from the distributor all of the distributor's inventory of the manufacturer's products and sales aids at the laid-in cost to the distributor including freight and cartage, provided that upon payment therefor the distributor shall transfer to the manufacturer good title to all such property free of liens and encumbrances.

(D) If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand. Any notice of termination or nonrenewal of the franchise to a distributor of the acquired product or brand shall be received at the distributor's principal place of business within the ninety-day period. If notice is not received within this ninety-day period, a franchise relationship is established between the parties. If the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal. Upon termination or nonrenewal of a franchise pursuant to this division, the distributor shall sell and the successor manufacturer shall repurchase the distributor's inventory of the terminated or nonrenewed product or brand as set forth in division (C) of this section, and the successor manufacturer also shall compensate the distributor for the diminished value of the

Ohio Rev. Code § 1333.85. The provision begins by stating a general rule: a franchise may not be terminated absent prior consent unless just cause exists and notice is provided. Subsection (A) then sets forth three circumstances that always constitute just cause, and for which notice is not required, essentially, a party's voluntary bankruptcy, involuntary bankruptcy, or loss of liquor permits. Next, subsection (B) lists four situations that never constitute just cause. As will be explained below, Plaintiffs maintain that two of those situations are relevant to the instant case: restructuring under (B)(2), and the "sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control" under (B)(4). Subsection (C) essentially requires a manufacturer to purchase the inventory of its brands from a terminated distributor.

MillerCoors seeks refuge in subsection (D). In essence, subsection (D) allows a successor manufacturer to terminate a franchise if certain criteria are met. Thus, "[i]f the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal." Ohio Rev. Code § 1333.85(D). The purpose of § 1333.85 is abundantly clear from its text: although the prohibition against cancelling a franchise absent just cause and notice

---

distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer. The value of the distributor's business that is directly related to the sale of the terminated or nonrenewed product or brand shall include, but shall not be limited to, the appraised market value of those assets of the distributor principally devoted to the sale of the terminated or nonrenewed product or brand and the goodwill associated with that product or brand.

Ohio Rev. Code § 1333.85.

applies to both manufacturers and distributors, the provision primarily protects distributors by limiting the circumstances under which a manufacturer may cancel or terminate a franchise. Where those limitations begin and end, however, is not precisely defined.

Section 1333.86 is the only section that focuses exclusively on the duties of distributors rather than those of manufacturers. For example, it requires distributors to maintain adequate facilities and personnel so as to ensure manufacturers' brands are "properly represented in the sales area." Ohio Rev. Code § 1333.86. It further imposes the duty upon distributors to act in good faith at all times. *Id.*

The final section of the Act creates civil remedies for violation of the Act. Ohio Rev. Code § 1333.87. The aggrieved party may file an action for "damages and for other relief." *Id.*

Although the Act imposes some reciprocal duties on manufacturers and distributors, when viewed in its entirely, the obvious thrust of the Act is to protect Ohio distributors.

**B. The Parties' Arguments**

Defendants' view of the these cases is simple: MillerCoors is a successor manufacturer under Ohio Rev. Code § 1333.85(D), and it is therefore entitled to terminate Plaintiffs' franchises without Plaintiffs' consent or just cause. Plaintiffs offer several arguments as to why that cannot be so. Plaintiffs first argue that the § 1333.85(D) successor manufacturer exception does not apply because Miller and Coors continue to exercise control over MillerCoors for purposes of § 1333.85(B)(4). Second, Plaintiffs assert that termination of the franchises absent just cause is

precluded because the creation of MillerCoors constituted a restructuring under § 1333.85(B)(2). Third, Plaintiffs contend that § 1333.85(D) does not permit termination of the franchises because MillerCoors voluntarily assumed the distribution agreements that previously existed between Plaintiffs and Miller and/or Coors. Fourth, Plaintiffs maintain that MillerCoors cannot be a successor manufacturer because, at the time of the transfer, MillerCoors was not a "manufacturer." Fifth, Plaintiffs suggest that MillerCoors cannot be a successor manufacturer because it has indicated that it will not provide Plaintiffs the "diminished value" compensation required by § 1333.85(D). The Court finds Plaintiffs' first argument to be dispositive, and will therefore limit its discussion to the issue whether Miller and Coors exercise control over MillerCoors.

### C. Exercise of Control: § 1333.85(B)(4)

As noted above, the Act specifies four circumstances which never constitute just cause for termination of a franchise. Ohio Rev. Code § 1333.85(B). One of those circumstances is "[a] manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." Ohio Rev. Code § 1333.85(B)(4). Plaintiffs argue that § 1333.85(B)(4) applies because Miller and Coors continue to exercise control over "another manufacturer," to which they transferred their brands, namely, MillerCoors. Furthermore, Plaintiffs assert that where § 1333.85(B)(4) is implicated, the successor manufacturer exception of § 1333.85(D) cannot apply. Defendants contend that § 1333.85(B)(4) does not apply because neither Miller nor Coors have majority control over MillerCoors, and either parent company can veto the proposed action of the other. In addition, Defendants suggest that § 1333.85(B)(4) is not implicated because the joint venture effected a

change in ownership and control over the Miller and Coors brands.

### 1. *InBev* and *Schieffelin*

Both sides in the instant case extensively discuss a decision by another branch of this Court in *InBev USA LLC v. Hill Distrib. Co.*, No. 2:05–cv–298, 2006 U.S. Dist. LEXIS 97423 (S.D. Ohio Apr. 3, 2006). Similar to the instant case, the issue in *InBev* was whether the plaintiff, InBev USA, was a successor manufacturer under Ohio Rev. Code § 1333.85(D). InBev USA was formed by the merger of Labatt USA and Beck's of North America ("BNA"). After the merger, InBev USA sought to simplify its distribution network. InBev USA concluded that it qualified as a successor manufacturer under § 1333.85(D), and notified several Ohio distributors that their franchise agreements would be terminated with respect to the Labatt USA and BNA brands. The distributors rejected the terminations, and InBev USA then filed a lawsuit in this Court seeking a declaratory judgment that the terminations were valid. The distributors counterclaimed, asserting that the purported terminations violated the Act. Both sides then sought summary judgment on a stipulated statement of facts.

InBev USA argued that Labatt USA and BNA were both manufacturers, and that following the merger, InBev USA was a successor manufacturer. The distributors contended that InBev USA was not a successor manufacturer because the merger was not arms-length but rather was a mere reshuffling of InBev Belgium's U.S. operations.

The court in *InBev* ruled that InBev USA was not a successor manufacturer under the Act. In reaching that conclusion, the Court found the prohibitions of § 1333.85(B) to be instructive, observing:

> Section 1333.85(B)(2) states that "the restructuring . . . of a manufacturer's business organization" is not just cause for termination of a franchise. Moreover, §1333.85(B)(4) states that the sale or other transfer of a brand to another manufacturer under common control is not just cause for termination. These provisions demonstrate a clear legislative intent to deny manufacturers the ability to terminate franchises due to corporate reorganizations or the shifting of brands among entities under common control.

*InBev*, 2006 U.S. Dist. LEXIS 97423, at *18. The Court reasoned that the Ohio

Legislature would not have intended the successor manufacturer exception

§ 1333.85(D) to "swallow" the just cause exceptions set forth in § 1333.85(B)(2) or

(B)(4). *Id.* at *21. Noting that "'[t]he restructuring, other than in bankruptcy

proceedings, of a manufacturer's business organization' does not constitute just cause

for termination of a franchise," the Court further explained: "That is exactly what took

place here. No assets, liabilities, products, or brands were transferred to any new

ownership group." *Id.* at *19 (quoting Ohio Rev. Code § 1333.85(B)(2)). Although the

Court in *InBev* rested its decision on the restructuring exclusion in § 1333.85(B)(2), the

Court alluded to the concept of control:

> Because no consideration was paid, *no products changed ownership control*, and this restructuring took place outside a bankruptcy proceeding, InBev USA's actions fit squarely within the conduct prohibited under §1333.85(B)(2).
> . . . .
>
> The Franchise Act permits termination of franchise agreements for just cause, with sixty days notice and the consent of the distributor, or when there is a *change in ownership and control of brands through an arms-length merger or acquisition*.

*Id.* at *20 (emphasis added).

Defendants in the instant case seize upon the emphasized language in the

above quote from *InBev*. They contend that the creation of MillerCoors marked a

change in ownership and control of the Miller and Coors brands. Before the formation of MillerCoors, Miller had 100% ownership and control of the Miller brands, and likewise Coors had 100% ownership and control of the Coors brands. Following the formation of MillerCoors, Miller and Coors each have a 50% voting interest in MillerCoors, and MillerCoors owns both the Miller and Coors brands. Miller and Coors each appoint five members of the ten-member MillerCoors board of directors. As Defendants note, neither partner can dictate what is done by MillerCoors, and each can veto a proposed action of the other. Defendants assert that because the formation of MillerCoors effected a change in ownership and control of the brands, § 1333.85(B)(4) does not preclude a finding that MillerCoors is a successor organization. Defendants maintain their position is also supported by a district court decision from the Northern District of Ohio in *Superior Beverage Co. v. Schieffelin & Co.*, Nos. 1:05–cv–834, 4:05–cv–868, 2007 WL 2756912 (N.D. Ohio Sept. 20, 2007).

The facts of *Schieffelin* are straightforward. Möet-Hennessy, S.A. ("MH"), a division of Louis Vuitton Möet-Hennessy, had the right to distribute certain French wines in the United States, including, for example, Dom Perignon. In 1980, MH formed Möet-Hennessy, USA ("MHUSA") to distribute wine in the United States. MH also acquired Schieffelin & Co. ("Schieffelin") as an importer and wholesaler of wines. MH caused MHUSA and Schieffelin to merge, with MHUSA as the surviving entity. MHUSA later changed its name to Schieffelin.

In 1987, MH and Guinness created a joint venture, called Schieffelin and Somerset ("S & S") to distribute their brands in the United States. The joint venture had two equal partners: Shieffelin Partner, Inc., owned by MH, and Somerset Partner, Inc.,

owned by Guinness Plc. Shieffelin transferred all of its distribution rights to S & S. S & S imported and sold MH and Guinness Plc brands in the United States from 1988 through 2004.

At some point, Guinness Plc became Diageo Plc. Diageo Plc decided to terminate the joint venture. By agreement of the parties, S & S transferred to Diageo Plc the right to distribute the Diageo Plc brands. S & S also transferred the right to distribute the MH brands back to Schieffelin. There was a hitch, however. Schieffelin's distributorship licences were terminated in 1988, thereby preventing immediate transfer of the MH brands from S & S to Schieffelin. So the parties agreed the transfer of brands would take place when Schieffelin acquired the requisite state licences, which they expected to occur by January 1, 2005.

On March 21, 2005, Schieffelin sent letters to various Ohio distributors with which S & S had franchise agreements. The letters informed the distributors that Schieffelin was terminating their distributorships under Ohio Rev. Code § 1333.85(D). The distributors responded by filing lawsuits in federal district court. After Schieffelin was enjoined from terminating the distributorships, the parties presented the issues to the court on cross motions for summary judgment. Schieffelin asserted two bases for termination: (1) just cause existed for termination, and (2) Schieffelin was a successor manufacturer under § 1333.85(D).

The court in *Schieffelin* ruled in favor of Schieffelin on both of its arguments.[3] With respect to the successor manufacturer issue, the court in *Schieffelin* compared the

---

[3]In *Tri-County Wholesale Dist. v. The Wine Group*, No. 2:10–cv–693 (S.D. Ohio Sept. 2, 2010), this Court disagreed with the *Schieffelin* court's interpretation of the just cause standard.

facts of the case before it to those on *InBev*. *Schieffelin*, 2007 WL 2756912, at *9–11.

Distinguishing *InBev*, the court reasoned as follows:

> Schieffelin & Co. points out that InBev Belgium, the parent company, retained control of the brands both before and after the corporate restructuring. In other words, all businesses in the corporate family maintained the right to distribute the brand at issue. Schieffelin & Co., however, transferred the exclusive right to distribute the Möet-Hennessy brands to S & S in 1988. Although Schieffelin Partner was owned by Möet-Hennessy, Schieffelin Partner comprised only 50% of the partnership. Diageo, a completely separate company, owned the other half of the S & S partnership. In the *InBev* case there was never another separately owned player. Although Schieffelin Partner had equal rights in the partnership, the language of the partnership agreement indicates that a supervisory committee, composed of members from both Guinness/Diageo and Möet-Hennessy, was responsible for all "major decisions." The term "major decisions" was defined in Annex 2 of the partnership agreement to include: approval of operating budgets; approval of long-term strategic plans; approval of purchases or leases of substantial assets of the distribution division of Schieffelin & Co.; approval of changes in products to be distributed, the location of offices, or the priority assignment of brands by the distribution division of Schieffelin & Co.; and approval of reorganization of distribution networks. (5:05 CV 868, Dkt. # 5068).
>
> S & S had exclusive control over the distribution of the Möet-Hennessy brands when Schieffelin transferred those rights in 1988. Schieffelin did not participate in the distribution of the Möet-Hennessy brands until S & S dissolved in 2004 and Schieffelin obtained a license from the State of Ohio to distribute the brands. In fact, Schieffelin did not even have the ability to terminate the franchise relationship it had with Goodman and Superior without the approval of S & S's supervisory committee, comprised of members appointed by Diageo. Diageo's ownership of half of the S & S partnership distinguishes the instant matter from *InBev*, where intra-corporate restructuring took place entirely within the same corporate family. The transfer of rights to distribute the Möet-Hennessy brands from S & S to Schieffelin & Co. was not "a contrived sale and/or paper merger." *InBev*. As a result, the Court finds that Scheffelin is a successor manufacturer under the Act as a matter of law.

*Schieffelin*, 2007 WL 2756912, at *10–11. Defendants argue that *Schieffelin* is directly

on point, and compels the conclusion that MillerCoors is a successor manufacturer.

Plaintiffs dispute Defendants' interpretation of *InBev* and *Schieffelin*. First,

Plaintiffs assert that the decision in *InBev* was restricted to whether restructuring occurred under § 1333.85(B)(2), and did not purport to rely on the "exercise of control" under §1333.85(B)(4). Second, Plaintiffs aver that the termination of the joint venture in *Schieffelin* does not resemble the facts of the instant case, which entails the *creation* of a joint venture. Moreover, they contend that the decision in *Schieffelin*, like *InBev*, turned on whether the unwinding of the joint venture was a restructuring under § 1333.85(B)(2), and not the continued "exercise of control" over the successor manufacturer. Plaintiffs also emphasize that the *InBev* and *Schieffelin* decisions refer to ownership and control over the *brands* as a measure of whether restructuring occurred, whereas § 1333.85(B)(4) concerns the manufacturer's exercise of control over "*another manufacturer*" to which the brand was transferred. In short, Plaintiffs argue that neither *InBev* nor *Schieffelin* stated a standard for determining whether the continued exercise of control over a transferee entity under § 1333.85(B)(4) precludes a finding that the transferee entity is a successor manufacturer for purposes of § 1333.85(D).

The court in *InBev* did not purport to create a standard to determine whether the exercise of control under § 1333.85(B)(4) precludes the transferee entity from being a successor manufacturer under § 1333.85(D). Although *InBev* mentions § 1333.85(B)(4), the decision settles on the application of the restructuring provision, § 1333.85(B)(2). The *InBev* Court's use of the term "control" consistently refers to control over *brands*, and therefore does not track the language of § 1333.85(B)(4), which concerns the exercise of control over the *transferee entity*. In addition, the Court in *InBev* was not faced with the issues the instant case presents, namely the scope of

the term "exercises control" and whether the retention of less-than-majority voting

interest avoids § 1333.85(B)(4). Further, inasmuch as *Shieffelin* merely distinguishes

*InBev*, the *Schieffelin* decision does not add clarity. Consequently, the Court declines

to interpret the scope of the undefined term "exercises control" through the lens of

*InBev* or *Shieffelin*.[4]

### 2. Construction of "exercises control"

In this diversity case, the Court must apply the substantive law of the
forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In doing so,
this Court is bound by the decisions of the state's highest court. *Pennington
v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). If the
state's highest court has not directly addressed the issue, however, this
Court must predict how the state's highest court would resolve the matter.
*Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th
Cir.2008). In that case, the decisions of the state's intermediate appellate
courts are deemed authoritative, unless there is a strong showing that the
state's highest court would reach a different result. *Id.*

*Ferron v. EchoStar Satellite, LLC,* 727 F. Supp. 2d 647, 655 (S.D. Ohio 2009). Here,

neither the Supreme Court of Ohio nor the Ohio intermediate appellate courts have

construed the term "exercises control" in Ohio Rev. Code § 1333.85(B)(4).

Although the Act does not define "exercises control," another Ohio statute

defines the term "control" in the context of the law governing corporations. Chapter

1704 of the Ohio Revised Code, which governs transactions involving shareholders,

states in part, "'Control,' 'controlled by,' or 'under common control with' refers to the

possession, directly or indirectly, of the power to direct or cause the direction of the

management and policies of a person, whether through the exercise of or the ability to

---

[4]The parties also cite *Esber Beverage Co. v. InBev USA, LLC*, No. 2006CA00113, 2007 WL 657691
(Ohio Ct. App. 5 Dist. Mar. 5, 2007). *Esber* extensively quotes and follows *InBev*. Like *InBev, Esber* does
not shed light on the scope and meaning of "exercises control."

exercise voting power, by contract, or otherwise."  Ohio Rev. Code § 1704.01(C)(6).[5]

The current edition of Black's Law Dictionary mirrors §1704.01(C)(6): "control, n. (16c)

The direct or indirect power to govern the management and policies of a person or

entity, whether through ownership of voting securities, by contract, or otherwise; the

power or authority to manage, direct, or oversee <the principal exercised control over

the agent>."  Bryan A. Garner, Black's Law Dictionary (9th ed. 2009).  Ohio courts

frequently consult Black's to interpret statutory terms.  *See State of Ohio ex rel. Turner*

*v. Eberlin*, 117 Ohio St. 3d 381, 384 (2009) ("We have often applied definitions from

Black's Law Dictionary to determine the meaning of undefined statutory language.").

Ohio appellate courts have applied the Black's definition of control, albeit in

circumstances that do not resemble the instant case.  *See Tucker v. Michael's Store*

*Inc.*, No. 1-02-94, 2003 WL 1571548, at *3  (Ohio Ct. App. 3 Dist. Mar. 28, 2003)

(applying Black's definition of control to determine zone of employment in slip and fall

workers' compensation case).

Federal securities law employs a virtually identical definition: "The term 'control'

(including the terms 'controlling,' 'controlled by' and 'under common control with')

means the possession, direct or indirect, of the power to direct or cause the direction of

the management and policies of a person, whether through the ownership of voting

securities, by contract, or otherwise."  17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.

Federal courts applying § 230.405 have held that minority shareholder status, by itself,

is insufficient to establish the "control" element of a control person liability claim under §

---

[5]MillerCoors is a Delaware limited liability company.  Delaware law contains a definition of control
substantially similar to Ohio Rev. Code § 1704.01(C)(6) and Black's.  *See* Del. Code Ann. § 203.

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). *Theoharous v. Fong*,

256 F.3d 1219, 1277 (11th Cir. 2001) (plaintiff failed to show defendant controlled the

general business affairs of corporation where defendant owned of 39% of shares and

had right to appoint four members of nine-member board); *In re Nat'l Century Fin.*

*Enter. Inc., Inv. Litig.*, 553 F. Supp. 2d 902, 912–13 (S.D. Ohio 2008) (status as a

20.76% stockholder, standing alone, did not satisfy control element of a control person

claim). Nevertheless, minority shareholder status does not preclude a finding of control:

> There is "no bright-line rule declaring how much stock ownership constitutes
> 'control' and makes one an 'affiliate'" under Rule 144. *SEC v. Cavanagh*, 445
> F.3d 105, 114 n. 19 (2d Cir. 2006). "Some commentators have suggested
> that ownership of something between ten and twenty percent is enough,
> especially if other factors suggest actual control." *Cavanagh*, 445 F.3d at 114
> n. 9 (citing Sidney Ravkind, *We New Wizards of Wall Street*, 66 Tex. B.J.
> 120, 126 n. 32 (2003)). In *Cavanagh*, the Second Circuit concluded that two
> partners in a small business would be affiliates by ownership because they
> were "controlling shareholders." *Cavanagh*, 445 F.3d at 114. Each owned
> nearly one-quarter of the company's stock, as did two other partners, and
> they sold their shares as a block. *Id.*

*Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 660 (D.N.J. 2009). *See also In*

*re Adelphia Commc'n Corp.Securities and Derivative Litig.*, 398 F. Supp. 2d 244, 262

(S.D.N.Y. 2005) (finding control sufficiently pleaded against defendant board chairman

who was minority shareholder and head of family which owned majority of shares).

Control in such cases is "'a question of fact which depends upon the totality of the

circumstances including an appraisal of the influence upon management and policies of

a corporation by the person involved.'" *S.E.C. v. Platforms Wireless Intern. Corp.*, 617

F.3d 1072, 1087 (9th Cir. 2010) (quoting *United States v. Corr*, 543 F.2d 1042, 1050

(2d Cir. 1976)); *Adelphia,* 398 F. Supp. 2d at 262 (control determined by considering

the total effect of all of the indicia of control in combination, not by examining any one

indicium in isolation).

The Court is mindful that federal securities law is not directly analogous to the instant case. Nonetheless, the Court predicts that if faced with the issue, the Supreme Court of Ohio would likewise apply a totality of the circumstances test as opposed to a bright line rule based on the percentage of the transferee entity's voting shares. The Supreme Court of Ohio would undoubtedly consult Black's Law Dictionary, as it has on numerous past occasions, to determine the definition of control, and consider the nearly identical definition in Ohio Rev. Code § 1704.01(C)(6). *See Turner*, 117 Ohio St. 3d at 384. Like the federal securities regulations, both Black's and the Ohio Revised Code definitions of control are broad, and recognize that control may flow from a variety of sources, including voting power, contract, "or otherwise." Given the scope of the definitions, it would make little sense to examine only voting power, as Defendants urge, to determine whether a previous manufacturer continues to exercise control over the successor manufacturer. Rather, to determine control, a court must consider all of the various sources of control together, as suggested by federal securities case law applying virtually the same definition. It is not difficult to understand why federal courts settled on a totality of the circumstances test to determine control. The definition invites it.

A totality of the circumstances test is also consistent with the language and purpose of the Act. The term "exercises control" is not limited by any modifiers. If the Ohio General Assembly had intended to limit "control" to "majority voting control," it could easily have included language to make such an intention clear. As the U.S. Magistrate Judge observed earlier in resolving a discovery dispute in these cases:

[T]here is nothing in the statute that says what a court may or may not take into account in determining whether the prior manufacturer does, or does not, exercise control over the new one. However, the phrase "exercises control" is fairly broad, and would seem to encompass both situations where the prior manufacturer has control on paper, and situations where, regardless of who has paper control of the new entity, the prior manufacturer still "exercises" control.

Reading that phrase broadly also seems consistent with the intent of the statute. Like other franchise acts (for example, the Ohio Motor Vehicle Dealers Act, O.R.C. § 4517.01 et seq.), the Alcoholic Beverage Franchise Act is designed in part to protect distributors from certain practices of beverage manufacturers. It recognizes that distributors often have a substantial investment in their businesses, including the physical assets and real property used to distribute the manufacturers' products, and that to allow a manufacturer unilaterally to terminate a franchise agreement puts the franchise distributors at great risk of harm. The just cause requirement for terminating a franchise agreement is intended to protect the franchisee from this type of arbitrary and potentially coercive act.

*Beverage Distrib., Inc. v. Miller Brewing Co.*, Nos. 2:08–cv–827, 2:08–cv–931, 2:08–cv–1112, 2:08–cv–1131, 2:08–cv–1136, 2:09–cv–0022, 2009 WL 1542730, at *5 (S.D. Ohio June 2, 2009). One Ohio court has likewise expressed that the purpose of the ABFA is "to remedy the lack of equal bargaining power between Ohio's alcoholic beverage wholesalers and out-of-state beverage manufacturers." *Esber Beverage Co. v. LaBatt USA Operating Co.*, No. 2009CV03142 at 8 (Stark Cnty. Ohio Common Pleas Dec. 1, 2009). *InBev* similarly noted that the ABFA "grants Ohio beer and wine distributors unique protections." 2006 U.S. Dist. LEXIS 97423, at *11. Given "the language of the statute and the purpose to be accomplished," a broad reading of the term "exercises control" is appropriate. *Id.* at *17 (quoting *Christe*, 88 Ohio St. 3d at 377) (internal quotations omitted).

In their final argument against such a construction, Defendants note that § 1333.85(D) refers to successor manufacturers created through merger. They

contend that in a typical merger, the owners of the absorbed entity usually retain some voting authority and ownership stake in the surviving entity. Defendants maintain the inclusion of mergers in § 1333.85(D) therefore indicates that the Ohio General Assembly contemplated that previous manufacturers would continue to exercise control over the successor manufacturer. The Court disagrees. "It is settled law that a merger involves the absorption of one company by another, the latter retaining its own name and identity, and acquiring the assets, liabilities, franchises and powers of the former. Of necessity, the absorbed company ceases to exist as a separate business entity." *Morris v. Investment Life Ins. Co.*, 27 Ohio St. 2d 26, 31 (1971). *See also* 15 Fletcher Cyc. Corp. § 7082 (2011). After a merger under § 1333.85(D), the absorbed previous manufacturer would no longer exist to exercise control over the new entity, regardless of whether elements of the previous manufacturer retained ownership or voting rights in the surviving successor manufacturer. Here, in contrast, there was no merger, and the previous manufacturers, Miller and Coors, continue to exist and may exercise control over MillerCoors. Accordingly, the Court rejects Defendants' argument that the reference to mergers in § 1333.85(D) shows that the Ohio legislature intended to allow previous manufacturers to exercise control over a successor manufacturer.

For the above reasons, the Court concludes that to determine whether a prior manufacturer exercises control over a successor manufacturer for purposes of Ohio Rev. Code § 1333.85(B)(4), the Court must consider all of the indicia of control under a totality of the circumstances standard. With the that principle in mind, the Court will examine all of the facts and circumstances to determine whether Miller and Coors exercise control over MillerCoors.

### 3.  Application of totality of the circumstances standard

#### a.  Equal control

MillerCoors is a joint venture.  Joint venture partners have a right to equal control of the joint venture.  *Ford v. McCue*, 163 Ohio St. 498, 502–03 (1955); *Grendell v. Ohio Envtl. Prot. Agency*, 146 Ohio App. 3d 1, 11 (9 Dist. 2001).  Absent equal control, no joint venture exists.  *Grendell*, 146 Ohio App. 3d at 11.  Defendants acknowledge that MillerCoors is a joint venture which Miller and Coors control equally.   Defs.'Mot. Sum. J. 1, ECF No. 115–1 .

Defendants make much of the fact that Miller and Coors each have a fifty percent minority voting interest, and that either joint venture partner can veto the proposed action of the other.  As noted above, minority voting interest by itself is not dispositive of the issue of control.  Moreover, although a fifty percent voting interest is a minority interest, it is just barely so.  The universe of control is limited to only two parties.  Miller and Coors have only each other to contend with should a dispute arise. In addition, the equal control and veto power Miller and Coors possess do not preclude a finding of control.  *Cox v. Lemonds*, 107 Ohio App.3d 442, 446–447 (Ohio Ct. App. 2 Dist. 1995).  In *Cox*, the court found that the plaintiff, a fifty percent partner, exercised actual control over the management of a partnership despite the fact that the defendant, the other fifty percent partner, had the right to cast a "tie-breaking" vote in the event of a disagreement.   In the instant case, neither joint venture partner has a tie-breaking vote.  Hence, Miller and Coors have a greater measure of control than did the plaintiff in *Cox*, who was nonetheless found to have the right to exercise "significant control" over the partnership.  *Id.* at 447.

From a common sense standpoint, equal control is a form of control. To the extent Defendants concede that Miller and Coors jointly control MillerCoors, they also tacitly acknowledge that MillerCoors does not control itself independently of Miller and Coors. Furthermore, the veto power is itself a form of control. It ensures that no action will be taken against the interests of Miller or Coors.

### b. Board of directors

Miller and Coors each appoint five members to the ten-member board of directors. The directors of MillerCoors owe their fiduciary duties to the company that appointed them, not MillerCoors. Typically, directors owe a fiduciary duty to the corporation and all of the shareholders. *See Thompson v. Cent. Ohio Cellular, Inc.*, 93 Ohio App. 3d 530, 540 (1994). In addition, all of the MillerCoors board members are current officers or employees of Miller or Coors. There are no independent directors. For example, Peter Coors, who is chairman of the Molson Coors board, also serves as chairman of the MillerCoors board. Operating Agreement § 5.6(a), ECF No. 115–9; Jordan Dep. 186, ECF No. 126–1; Long Dep. 41–42, ECF No. 126–4. In addition, if the MillerCoors board is deadlocked, the matter is referred to the SAB Miller CEO and Molson Coors CEO. *Id.* § 12. If the CEOs are unable to agree, the matter is deemed to have not been approved by the board. *Id.* § 12.7. That feature of the Operating Agreement is a reflection of the veto power in that it ensures that no action will be taken against the interests of Miller or Coors. In sum, Miller and Coors exercise control over the MillerCoors board in at least three ways: (1) the directors owe a fiduciary duty to the company that appointed them, not MillerCoors; (2) all of the MillerCoors directors are current officers or employees of Miller or Coors; and (3) disputed matters may ultimately

be decided by the CEOs of SAB Miller and Molson Coors.

### c. MillerCoors' executive team

Miller and Coors selected the officers of MillerCoors. Coors appointed the CEO and Miller appointed the CFO. All of the executive officers of MillerCoors are former officers or employees of Miller or Coors. For example, Coors appointed Leo Keily, the former CEO of Coors, to be the CEO of MillerCoors. Similarly, Miller appointed Gavin Hattersley, the former CFO of Miller, to be the CFO of MillerCoors. The CEOs of SAB Miller and Molson Coors or their nominees comprise two members of the four-member committee that recommends executive compensation and benefits to the MillerCoors board. The Operating Agreement provides for monthly cross-functional meetings between the MillerCoors executives and their counterparts in SAB Miller and Molson Coors, including the CEOs and CFOs of all three companies. The cross-functional meetings are held. On one occasion, the MillerCoors CEO sought input from from SAB Miller and Molson Coors about a request by a distributor to assume distribution rights in Denver, Colorado. In addition, the COO of MillerCoors indicated that if the CEO of SAB Miller disagreed with him and MillerCoors CEO about the repositioning of the Miller Lite brand, the will of the SAB Miller CEO would control. Defendants concede that the joint venture partners "*collectively* have the power to appoint the management of MilllerCoors and reserved the right to *jointly* approve management's recommendations on major issues." Defs.' Mot. Summ. J. 3, ECF No. 115 (emphasis in original).

Miller and Coors exercise authority over the appointment of MillerCoors executive officers, all of whom are former officers or employees of Miller or Coors. Miller and Coors also participate in setting the MillerCoors executives' salaries and

benefits. The MillerCoors executives collaborate and meet with their Miller and Coors counterparts on a regular basis. Miller and Coors acknowledge that they reserve the right to approve managements' recommendations on major issues. In light of these facts, the Court finds that Miller and Coors exercise a fair degree of control over the MillerCoors executive officers.

### d. Revenues and funding

MillerCoors' revenues and cash are distributed directly to Miller and Coors. MillerCoors then asks Miller and Coors for cash back to meet MillerCoors' operating and capital requirements. Thus, Miller and Coors hold the purse strings. MillerCoors does not take on any debt under this arrangement. That MillerCoors must ask Miller and Coors for funding is an indicia of control.

### e. Evidence that MillerCoors operates independently from Miller and Coors

Defedants do not seriously challenge the evidence Plaintiffs offer to show that Miller and Coors exercise control over MillerCoors. *See* Defs.' Reply 3 n.4, ECF No. 135 (making blanket statement that MillerCoors disputes many of Plaintiffs' "facts," but not setting forth or citing any contrary evidence). The Court has no duty to comb the record to search for evidence supporting Defendants' bald proclamation that they dispute unspecified factual assertions made by Plaintiffs. *See In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001); *Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010). Defendants, in turn, offer little affirmative evidence that MillerCoors operates independently. They refer to § 1.1 of the Operating Agreement, which states that SAB Miller, Molson Coors, Miller, and Coors do not control MillerCoors. Operating

Agreement § 1.1, ECF No. 115–9. In addition, one of the MillerCoors board's first decisions was to issue a policy statement which indicated that although there would be a "culture of collaboration" between the shareholders and MillerCoors, the shareholders would not use the collaborative process to control MillerCoors. Board Policy 1, ECF No. 116–1. For the most part, Defendants avow on paper that MillerCoors operates independently.

### f. Considering the indicia of control together

As set forth above, Miller and Coors exercise control over MillerCoors through their equal voting power, veto power, the appointment of directors, all of whom are present officers or employees of the joint venture partners, and who owe their fiduciary duty only to Miller or Coors, their influence over the executive team, and their funding of MillerCoors. The indicia to the contrary consist primarily of paper expressions of MillerCoors' independence. Viewed together, the indicia of control are extensive. The Court therefore finds as a matter of law that Miller and Coors exercise control over MillerCoors within the meaning of Ohio Rev. Code § 1333.85(B)(4). Accordingly, the Court holds that MillerCoors is not a successor manufacturer under Ohio Rev. Code § 1333.85(D). Just cause does not exist for termination of Plaintiffs' distributorships, and Plaintiffs do not consent to termination. The ABFA therefore prohibits MillerCoors from terminating Plaintiffs' distributorships.

## IV.  DISPOSITION

For the above reasons, the Court **GRANTS** Plaintiffs' motions for summary judgment and **DENIES** Defendants' motions for summary judgment.

Plaintiffs shall submit a proposed final judgment entry for these cases acceptable in form to Defendants within seven days after the date of this order.

The Clerk shall remove the following motions from the Civil Justice Reform Act motions report: (1) in Case No. 2:08–cv–827: ECF Nos. 115, 119, 122, 123, 124, 125, 127, and (2) in Case No. 2:08–cv–1131: ECF Nos. 110 and 112.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**